# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| JOHN GALVAN and PATRICK TAYLOR, on behalf of themselves and all others similarly situated, | No. 1:20-cv-04511 |
| Plaintiffs, | |
| v. | |
| STEVEN T. MNUCHIN, in his official capacity as United States Secretary of the Treasury; the UNITED STATES DEPARTMENT OF THE TREASURY; CHARLES P. RETTIG, in his official capacity as United States Commissioner of Internal Revenue; the INTERNAL REVENUE SERVICE; the UNITED STATES OF AMERICA; and DOES 1-10, | |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

<u>Page</u>

I.      NATURE OF ACTION ........................................................................................1

II.     PARTIES .............................................................................................................4

        A.      Plaintiffs ..................................................................................................4

        B.      Defendants ...............................................................................................5

III.    JURISDICTION AND VENUE .........................................................................7

IV.     FACTUAL ALLEGATIONS ..............................................................................8

        A.      Unprecedented disruption to the global economy caused by the
                COVID-19 pandemic leads Congress to pass the CARES Act. .............8

        B.      The CARES Act unambiguously requires the Treasury and IRS
                Defendants to provide Economic Impact Payments to all "Eligible
                Individuals," including incarcerated people. .......................................10

        C.      Defendants refuse to provide Economic Impact Payments to
                incarcerated individuals, despite the clear directive of Congress to
                do so. .....................................................................................................13

        D.      Defendants' actions obstruct Congress's goals in passing the
                CARES Act. ...........................................................................................17

        E.      Defendants' actions violate the law and have caused substantial
                harm to Plaintiffs...................................................................................19

V.      CLASS ALLEGATIONS .................................................................................21

VI.     CAUSES OF ACTION .....................................................................................24

        COUNT I Violation of the Administrative Procedure Act (APA), 5 U.S.C.
                § 706(1) for failure to make Economic Impact Payments to
                incarcerated people in violation of the CARES Act (Claim for
                Declaratory and Injunctive Relief)........................................................24

        COUNT II: Violation of the Administrative Procedure Act (APA), 5
                U.S.C. § 706(2) for issuing IRS FAQ Number 15 and establishing
                an IRS policy that denies Economic Impact Payments to
                incarcerated people, in violation of the CARES Act. (Claim for
                Declaratory and Injunctive Relief)........................................................25

        COUNT III: Claim for damages pursuant to the CARES Act, 26 U.S.C. §
                6428 and the Little Tucker Act, 28 U.S.C. § 1346(a)(2) .....................27

RELIEF REQUESTED....................................................................................................28

Plaintiffs John Galvan and Patrick Taylor, by and through their attorneys, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), bring this Class Action Complaint against Steven Mnuchin, in his official capacity as United States Secretary of the Treasury, and the United States Department of the Treasury (the "Treasury Defendants"); Charles P. Rettig, in his official capacity as Commissioner of Internal Revenue, and the Internal Revenue Service (the "IRS Defendants"); and the United States of America (collectively "Defendants"). Plaintiffs allege, based upon personal knowledge, investigation by Counsel, and as to all other matters upon information and belief, as follows:

## I.    NATURE OF ACTION

1.      When the text of a Congressional statute is unambiguous, the executive agency charged with implementing that statute must act in strict accordance with the language Congress enacted. Over-reaching by executive agencies—creating their own carve outs or exceptions to laws enacted by Congress—threatens the separation of powers at the core of our federalist system.

2.      When such over-reaching prevents hundreds of thousands of Americans from receiving badly needed relief payments granted by Congress, in the midst of a global pandemic, that existential threat becomes a very real harm.

3.      Here, senior executives in the Trump administration—Treasury Secretary Mnuchin and IRS Commissioner Rettig, along with the agencies they lead—usurped Congress's lawmaking power and unilaterally refused to issue relief payments to incarcerated people, despite the clear mandate of Congress to do so. In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in order to combat the steep economic downturn caused by the COVID-19 Pandemic. The scale of the CARES Act is unprecedented—directing trillions of dollars into every corner of the American economy.

4.      To quickly stimulate the economy, and provide relief to millions of Americans, the CARES Act created a 2020 tax credit to be disbursed immediately in the form of a direct payment ("Economic Impact Payment") of $1,200 to "eligible individuals" generally making $75,000 or less.

5.      Consistent with its purpose to rapidly disburse funds to low and middle-income people throughout the economy, the CARES Act is broad in scope. It excludes only four categories of people from receiving the payments: individuals without a social security number, nonresident aliens, dependents claimed on the tax return of another taxpayer, and estates or trusts. There are no other carve outs or exceptions. The statute is clear and unambiguous regarding who is "eligible" for payments and who is not.

6.      On April 10, 2020, the IRS began issuing the Economic Impact Payments to individuals. Shortly thereafter, the Treasury Department's Inspector General for Tax Administration ("Inspector General") expressed concern to the IRS that recipients included incarcerated people. The IRS responded, correctly, that incarcerated people fit within the CARES Act definition of "eligible individuals," and are thus entitled to receive the payments. This contemporaneous construction of the statute by the IRS was the correct decision because the statutory criteria for the entitlement are plain and no exception applies.

7.      However, within weeks, the IRS "changed its position" and decided not to send Economic Impact Payments to incarcerated people despite the statutory language. The IRS halted all payments to incarcerated people and sought help from prisons, jails, and other correctional facilities nationwide to intercept checks that it had already sent out.

8.      Defendants contravened the plain language of the CARES Act and denied payments to incarcerated people who are "eligible individuals" under the statute.

9.     The effects of Defendants' conduct are severe and ongoing. With the CARES Act, Congress used a broad brush to address an unparalleled economic crisis by disbursing funds immediately to protect vulnerable populations. Families with an incarcerated parent are among the most vulnerable and, in this respect, Defendants' decision to disobey the Congressional command is most cruel. Incarcerated people and their families are primarily low-income and come disproportionately from minority communities that have endured long histories of discrimination at the hands of the government authority. These communities are among the hardest hit by the economic slowdown caused by COVID-19. Economic Impact Payments have the potential to assist with their serious needs. Indeed, more than 50% of incarcerated persons have at least one minor child and many of these remain under child support obligations should they receive funds while incarcerated. Spending by prisoners, pre-trial detainees, and their families furthers Congress's goal of protecting the needy in this crisis while also stimulating economic activity and supporting businesses and workers.

10.     People in custody are forced to spend exorbitant sums to communicate with their loved ones. Many are unable to earn income while in custody through work for the prison or jail where they are incarcerated. Accordingly, the costs for communicating with their families fall predominantly on the families of people in custody, the majority of whom struggle to meet even their basic needs. Communication with family members is especially critical for people in prison and jail during the COVID-19 pandemic, as many prisons and jails throughout the country have locked down the individuals in custody in order to prevent rampant transmission of the virus. Communication with family members is, sadly, the only contact with the world outside of the cell for many Class Members. Defendants cannot and should not narrow the scope of the CARES Act so casually.

11.     Because of Defendants' unlawful conduct, Plaintiffs and the Class were denied their Economic Impact Payments of up to $1,200 per adult and $500 per dependent child. Plaintiffs seek declaratory and injunctive relief—requiring Defendants to issue the Economic Impact Payments to Plaintiffs and the Class as rapidly as possible, along with any damages and other relief to which they are entitled.

## II.     PARTIES

### A.     Plaintiffs

**John Galvan**

12.     Plaintiff John Galvan is in the custody of the Illinois Department of Corrections and resides at Stateville Correctional Center in Joliet, Illinois.

13.     Mr. Galvan has been in custody since 1990 when he was convicted of a crime he did not commit. He is challenging that conviction in Illinois state court.

14.     As an incarcerated person, Mr. Galvan relies upon his limited funds to survive and maintain communication with his family.

15.     While incarcerated, Mr. Galvan caused to be filed an application for an Economic Impact Payment pursuant to the CARES Act. Mr. Galvan satisfies each of the eligibility requirements for relief under the CARES Act as he is a United States citizen, not a dependent of another taxpayer, and has a work-eligible Social Security Number. Due to his incarceration, Mr. Galvan's income is likewise below the $75,000 threshold to qualify for a payment. To date, Mr. Galvan has not received the Economic Impact Payment in spite of his timely application, and he has been damaged by the Defendants' conduct alleged herein.

**Patrick Taylor**

16.     Plaintiff Patrick Taylor is incarcerated at the Cook County Jail in Chicago, Illinois. He is a pre-trial detainee who has resided at the Cook County Jail since 2016.

17.     Mr. Taylor has been in custody since 2007 when he was arrested for a crime he did not commit. In 2016, Plaintiff's wrongful conviction was reversed when the Illinois Appellate Court granted him a new trial. Mr. Taylor continues to await his retrial while incarcerated at the Cook County Jail.

18.     As a pretrial detainee, Mr. Taylor relies upon his limited sources of funds to survive and maintain communication with his loved ones.

19.     While incarcerated, Mr. Taylor caused to be filed an application for an Economic Impact Payment pursuant to the CARES Act. Mr. Taylor satisfies each of the eligibility requirements for relief under the CARES Act as he is a United States citizen, not a dependent of another taxpayer, and has a work-eligible Social Security Number. Due to his incarceration, Mr. Taylor's income is likewise below the $75,000 threshold to qualify for a payment. To date, Mr. Taylor has not received the Economic Impact Payment in spite of his timely application, and he has been damaged by the Defendants' conduct alleged herein.

**B.     Defendants**

20.     Defendant Steven Mnuchin is sued in his official capacity as United States Secretary of the Treasury. In that capacity, Secretary Mnuchin exercises full authority to administer and enforce the internal revenue laws and has the power to create an agency to enforce these laws.[1] As part of his duties, Secretary Mnuchin oversees the United States Commissioner of Internal Revenue and directs Treasury policy under the CARES Act. At all relevant times, Secretary Mnuchin acted in an official capacity and under color of legal authority.

---

[1] I.R.S., The Agency, Its Mission and Statutory Authority, (citing 26 U.S.C. § 7803), https://www.irs.gov/about-irs/the-agency-its-mission-and-statutory-authority.

- 5 -

21.     Defendant Charles P. Rettig is sued in his official capacity as United States Commissioner of Internal Revenue. In that capacity, Commissioner Rettig administers the application of the internal revenue laws and tax conventions to which the United States is a party.[2] Commissioner Rettig reports to Secretary Mnuchin. As part of his duties, Commissioner Rettig oversees the issuance of Economic Impact Payments to eligible individuals under the CARES Act. At all relevant times, Commissioner Rettig acted in an official capacity and under color of legal authority.

22.     Defendant United States Department of the Treasury is a department of the executive branch of the United States government headquartered in Washington, D.C. and an agency of the United States within the meaning of 5 U.S.C. § 552(f)(1). The Department of the Treasury operates and maintains systems that are critical to the nation's financial infrastructure, such as the production of coin and currency, the disbursement of payments to the American public, revenue collection, and the borrowing of funds necessary to run the federal government.[3]

23.     Defendant Internal Revenue Service is a bureau within the United States Department of the Treasury headquartered in Washington, D.C. The Internal Revenue Service was organized to carry out the responsibilities of the Secretary of the Treasury under 26 U.S. Code § 7801.[4] It calculates and sends Economic Impact Payments to Eligible Individuals under the CARES Act.

---

[2] *Id.*

[3] U.S. Dep't of Treasury, Role of the Treasury, https://home.treasury.gov/about/general-information/role-of-the-treasury.

[4] I.R.S., The Agency, Its Mission and Statutory Authority, https://www.irs.gov/about-irs/the-agency-its-mission-and-statutory-authority.

24.     Defendant United States of America is sued as a proper Defendant in an action for money damages under the CARES Act.

### III.     JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346 because the action arises under the laws of the United States. This Court has jurisdiction over Plaintiffs' Administrative Procedure Act claim (Claim I) pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702. Plaintiffs bring these claims for declaratory and injunctive relief, *see* 5 U.S.C. §§ 705, 706, presenting a federal question. *See* 28 U.S.C. § 1331.

26.     The Court has subject matter jurisdiction over this action's request for damages under 28 U.S.C. § 1346(a)(2), because each of the Class Members' claims is less than $10,000.

27.     This Court also has authority to grant Plaintiffs' request for declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

28.     Neither the tax exception in 28 U.S.C. § 2201 nor the Anti-Injunction Act, 26 U.S.C. § 7421, deprive this Court of jurisdiction, because this is not a suit with respect to federal taxes or an action seeking to restrain the assessment or collection of federal taxes.

29.     The United States has waived sovereign immunity for this action for declaratory and injunctive relief against its agencies, and the agencies' officers are sued in their official capacities, pursuant to 5 U.S.C. § 702.

30.     Plaintiffs' claims for attorneys' fees and costs are authorized by 28 U.S.C. § 2412.

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1). A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, Plaintiffs John Galvan and Patrick Taylor reside in Illinois within this District, and no real property is involved in this action.

## IV.    FACTUAL ALLEGATIONS

**A. Unprecedented disruption to the global economy caused by the COVID-19 pandemic leads Congress to pass the CARES Act.**

32.    On December 31, 2019, governmental entities in Wuhan, China confirmed that health authorities were treating dozens of cases of a mysterious, pneumonia-like illness.[5] Days later, researchers in China identified a new virus that had infected people in Asia, subsequently identified and referred to as the novel coronavirus, or COVID-19.[6]

33.    By January 21, 2020, officials in the United States were confirming the first known domestic infections of COVID-19.[7]

34.    On January 30, 2020, the World Health Organization ("WHO") officially declared COVID-19 as a "Public Health Emergency of International Concern."[8] On March 11, 2020, the WHO's Director General, Dr. Tedros Adhanom Ghebreyesus, declared COVID-19 a pandemic.[9] On March 13, 2020, President Donald Trump declared COVID-19 a national emergency.[10]

---

[5] Sui-Lee Wee and Donald G. McNeil Jr., *China Identifies New Virus Causing Pneumonialike Illness*, N.Y. Times, Jan. 8, 2020, available at https://www.nytimes.com/2020/01/08/health/china-pneumonia-outbreak-virus.html.

[6] *Id.*

[7] Center for Disease Control, First Travel-related Case of 2019 Novel Coronavirus Detected in United States, Press Release, (Jan. 21, 2020), https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html.

[8] Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of the novel coronavirus (2019-nCoV), World Health Organization, (Jan. 30, 2020), https://www.who.int/news-room/detail/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).

[9] WHO Director General, WHO Director-General's Opening Remarks at the Media Briefing on COVID-19, (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[10] The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, (Mar. 13, 2020),

35.     COVID-19's effect on the American economy was swift and devastating. GDP growth, which had continued uninterrupted since 2009, suddenly halted as states, counties, and municipalities across the country issued "shelter-in-place" orders or urged their citizens to stay at home. According to early estimates by the Bureau of Economic Analysis, real GDP contracted at an annual rate of 4.8% in the first quarter of 2020.[11] During the second quarter of 2020, real GDP collapsed, falling at an annualized rate of 32.9%—the largest downturn in modern U.S. history.[12] "Consumer spending declined sharply, contributing -5.3 percentage points to the first quarter's contraction. Americans are dramatically curtailing expenditures as the Nation responds to COVID-19."[13]

36.     According to the Federal Reserve, "19 percent of all adults reported either losing a job or experiencing a reduction in work hours in March."[14] Low-income Americans were particularly hard hit. "Thirty-nine percent of people working in February [2020] with a

---

https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[11] Council of Economic Advisors, Exec. Office of the President, An In-Depth Look at COVID-19's Early Effects on Consumer Spending and GDP, (Apr. 29, 2020) https://www.whitehouse.gov/articles/depth-look-covid-19s-early-effects-consumer-spending-gdp/.

[12] U.S. Dep't of Commerce, Bureau of Economic Analysis, Gross Domestic Product, 2nd Quarter 2020 (Advance Estimate) and Annual Update, (July 30, 2020), https://www.bea.gov/news/2020/gross-domestic-product-2nd-quarter-2020-advance-estimate-and-annual-update.

[13] Council of Economic Advisors, Exec. Office of the President, An In-Depth Look at COVID-19's Early Effects on Consumer Spending and GDP, (Apr. 29, 2020) https://www.whitehouse.gov/articles/depth-look-covid-19s-early-effects-consumer-spending-gdp/.

[14] Federal Reserve Board of Governors, Report on the Economic Well-Being of U.S. Households in 2019, Featuring Supplemental Data from April 2020 (May 2020) at 53, https://www.federalreserve.gov/publications/files/2019-report-economic-well-being-us-households-202005.pdf.

household income below $40,000 reported a job loss in March [2020]."[15] "Sixty-four percent of adults who reported a job loss or reduction in hours expected to be able to pay all their bills in full in April [2020], compared to 85 percent of those without an employment disruption."[16] Workers with lower levels of education reported that, if they showed coronavirus symptoms, they could not take any time off work without a reduction in income.[17]

37.    On March 25, 2020, less than two weeks after President Trump declared a national emergency, the Senate passed the CARES Act with a vote of 96 to 0.[18] On March 27, the House of Representatives passed the CARES Act by voice vote.[19] That same day, President Trump signed the CARES Act into law.[20]

**B.    The CARES Act unambiguously requires the Treasury and IRS Defendants to provide Economic Impact Payments to all "Eligible Individuals," including incarcerated people.**

38.    The scope of the CARES Act was unprecedented—injecting trillions of dollars into the economy. As President Trump noted at the signing ceremony, the CARES Act was "the single-biggest economic relief package in American history" designed to "deliver urgently needed relief to our nation's families, workers, and businesses."[21]

---

[15] *Id.*

[16] *Id.* at 54–55.

[17] *Id.* at 55, https://www.federalreserve.gov/publications/files/2019-report-economic-well-being-us-households-202005.pdf.

[18] The White House, Remarks by President Trump at Signing of H.R., The CARES Act, (Mar. 27, 2020) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-h-r-748-cares-act/.

[19] The White House, Remarks by President Trump at Signing of H.R., The CARES Act, (Mar. 27, 2020) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-h-r-748-cares-act/.

[20] *Id.*

[21] *Id.*

39.     Congress further evidences its expansive purpose of stimulating the national economy in exempting the Economic Impact Payments from the claims of government creditors, including the federal government itself. Unlike ordinary federal tax refunds and previous rounds of stimulus payments during prior economic downturns, section 2201(d) of the CARES Act shields the Economic Impact Payments from offset or attachment for past-due federal or state debts of any kind. Child support recipients represent the only interest that Congress deemed sufficiently important to include as a beneficiary to another individual's Economic Impact Payment.

40.     Section 2201 of the CARES Act amends subtitle F, Chapter 65, subchapter B of the Internal Revenue Code of 1986, by adding a new Section 6428. This section, codified at 26 U.S.C. § 6428, provides a tax credit to be disbursed immediately as an "advance refund" or "Economic Impact Payment" to individuals. Section 6428(f)(3)(A) directs the Secretary to "refund or credit any overpayment attributable to this section *as rapidly as possible*."

41.     The language defining the Economic Impact Payment benefit is mandatory, stating that each "eligible individual" *shall* receive a credit of $1,200 or $2,400 if filing a joint return, together with an additional $500 for each of the individual's "qualifying children." Section 6428(a) (emphasis added). Moreover, the Secretary is forbidden from delaying the payment to any eligible individual, as the statute commands the Secretary to make the payments "as rapidly as possible." 26 U.S.C. § 6428(f)(3)(A).

42.     Section 6428(d) unambiguously defines who qualifies as an "eligible individual" for payments under the CARES Act.

"For the purposes of this section, the term "eligible individual" means ***any individual other than***:

(1) any nonresident alien individual;

(2) any individual with respect to whom a deduction under section 151 is allowable to another taxpayer for a taxable year beginning in the calendar year in which the individual's taxable year begins [i.e., a dependent]; or

(3) an estate or trust.

There is no exception for incarcerated persons, and Defendants cannot rewrite the law.

43.     Section 6428(c) phases out the credit for eligible individuals who make more than $75,000 and eligible married individuals filing jointly who make more than $150,000.

44.     Additionally, Section 6428(g) generally excludes individuals who do not have a Social Security Number.

45.     To determine whether an individual is an "eligible individual" and otherwise qualifies for the Economic Impact Payment, the CARES Act directs the Treasury Secretary to refer to an individual's 2019 tax return or 2018 tax return if the individual's 2019 return has not yet been filed. 26 U.S.C. § 6428(f)(5). If neither return has been filed, then the CARES Act allows the Treasury Secretary to use income information for Social Security and Railroad Retirement benefits to distribute the Economic Impact Payment.

46.     Individuals without a filed 2019 return, 2018 return, or Social Security or Railroad Retirement benefits still qualify for the Economic Impact Payment, because they are "eligible individuals" under 26 U.S.C. § 6428(d). Recognizing this reality, the IRS created an online portal ("the Non-Filer Portal") through which those without a 2019 return filing requirement could register for an Economic Impact Payment.[22]

---

[22] *See* I.R.S., Non-Filers: Enter Payment Info Here, https://www.irs.gov/coronavirus/non-filers-enter-payment-info-here.

47.     Thus, Class Members without a filed 2019 return, filed 2018 return, Social Security or Railroad Retirement benefits, or a 2019 return filing requirement, have and may continue to register for Economic Impact Payments using the Non-Filer Portal.

48.     Under the plain meaning of the CARES Act, Plaintiffs are "eligible individuals" because they are individuals not subject to any of the exclusions listed under Section 6428(d) or (g). Their income likewise falls within the eligibility range under Section 6428(c). As "eligible individuals," Plaintiffs were and are legally entitled to receive an Economic Impact Payment.

**C.      Defendants refuse to provide Economic Impact Payments to incarcerated individuals, despite the clear directive of Congress to do so.**

49.     On April 10, 2020, exactly two weeks after the CARES Act was signed into law, the IRS began issuing Economic Impact Payments to individuals.[23] The IRS issued more than 81.4 million payments totaling more than $147.6 billion that day.[24]

50.     Shortly thereafter, the Treasury Department's Inspector General for Tax Administration ("Inspector General") "identified payments that were sent to individuals who were prisoners."[25] On April 14, the Inspector General "notified IRS management of [its] concerns with the issuance of payments to prisoners."[26] The IRS management responded,

---

[23] U.S. Dep't of Treasury, Inspector General for Tax Administration, Interim Results of the 2020 Filing Season: Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions (June 30, 2020), at 3, https://www.treasury.gov/tigta/auditreports/2020reports/202046041fr.pdf.

[24] *Id.* at 4.

[25] *Id.* at 4.

[26] *Id.* at 4–5.

correctly, that these payments were authorized because the CARES Act did not list incarcerated individuals among the excluded groups.[27]

51.     Soon after, the IRS "changed its position" and decided that prisoners were not entitled to Economic Impact Payments.[28] Put another way, the IRS declared that prisoners were not "eligible individuals" under the CARES Act.

52.     Upon information and belief, Plaintiffs allege that Defendants Treasury Secretary Mnuchin and the Department of Treasury directed Defendants Commissioner Rettig and the IRS to change the IRS's position and halt the disbursement of Economic Impact Payments to incarcerated people.

53.     On May 6, 2020, the IRS published the policy change by adding Q&A Number 15 to the FAQ portion of its website:[29]

> **∨ Q15. Does someone who is incarcerated qualify for the Payment? (added May 6, 2020)**
>
> A15. No. A Payment made to someone who is incarcerated should be returned to the IRS by following the instructions about repayments. A person is incarcerated if he or she is described in one or more of clauses (i) through (v) of Section 202(x)(1)(A) of the Social Security Act (42 U.S.C. § 402(x)(1)(A)(i) through (v)). For a Payment made with respect to a joint return where only one spouse is incarcerated, you only need to return the portion of the Payment made on account of the incarcerated spouse. This amount will be $1,200 unless adjusted gross income exceeded $150,000.

---

[27] *Id.* at 5.

[28] *Id.*

[29] IRS, Economic Impact Payment Information Center, https://www.irs.gov/coronavirus/ economic-impact-payment-information-center#collapseCollapsible1591708532854. This FAQ was originally designated as FAQ 12. However, subsequent additions to the IRS FAQs for the Economic Impact Payments moved this FAQ to its current position.

54.     Defendants have indicated that its FAQs on the Economic Impact Payment represent their final word on the matter. The IRS Chief Counsel, Michael Desmond, speaking on a webinar on May 6, 2020, noted that "I don't think we're going to take every FAQ and turn that into a full-blown notice or certainly a Treasury decision or proposed regulation."[30]

55.     To date, neither the Treasury nor the IRS have issued a proposed regulation or other sub-regulatory guidance (such as a Revenue Ruling, Revenue Procedure, IRS Notice, or otherwise) regarding distribution of the Economic Impact Payments to incarcerated individuals. Because the FAQ consummates Treasury and the IRS's decision-making process, and imposes rights and obligations with binding legal consequences—i.e., the arbitrary denial of Economic Impact Payments to millions of incarcerated people—this constitutes final agency action for purposes of the Administrative Procedure Act.

56.     The IRS offered no legal basis for importing criteria from a completely different statute with a different benefits scheme into the CARES Act. Indeed, Defendants still have not provided any authority or justification supporting their position that incarcerated people do not qualify for payment under the CARES Act.[31] The IRS's citation to a provision of the Social Security Act that denies certain Social Security benefits to incarcerated persons[32] does not support denial of tax credits or Economic Impact Payments to incarcerated persons under the

---

[30] William Hoffman, *Lawsuit Claims IRS Violates APA with Information Guidance*, TaxNotes, July 28, 2020, https://www.taxnotes.com/tax-notes-today-federal/litigation-and-appeals/lawsuit-charges-irs-violated-apa-informal-guidance/2020/07/28/2crv3.

[31] Rebecca Boone, *US inmates got virus relief checks, and IRS wants them back*, Associated Press, June 24, 2020, https://apnews.com/0810bb67199c9cef34d4d39ada645a92.

[32] IRS, Economic Impact Payment Information Center, https://www.irs.gov/coronavirus/economic-impact-payment-information-center#collapseCollapsible1591708532854 (citing Social Security Act 42 U.S.C. § 402(x)).

CARES Act. To the contrary—the Social Security Act teaches us that Congress knows how to exclude incarcerated persons from benefit payments when it wants to. Indeed, Congress excluded such individuals from prior stimulus payment provisions under the American Recovery and Reinvestment Act of 2009[33] by reference to the same provision in the Social Security Act. But Congress chose not to do so under the CARES Act. The IRS has no authority or discretion to graft a statutory exception onto an Act of Congress that contains none.

57.     Once the Treasury and IRS Defendants decided they would no longer comply with the terms of the CARES Act, they set about actively blocking incarcerated people from receiving their Economic Impact Payments. Defendants asked prison and jail officials across the country to intercept Economic Impact Payment checks that had already been mailed to incarcerated people, and to return those checks to the IRS. In addition, Defendants provided the Bureau of the Fiscal Service ("BFS")[34] with Taxpayer Identification Numbers associated with incarcerated people and requested that BFS remove these numbers from the payment files.[35] Thus, incarcerated people would be excluded as the IRS continued making the Economic Impact Payments.

58.     Although the language Defendants used in FAQ 15 could technically be interpreted to exclude only convicted prisoners from receiving Economic Impact Payments, in

---

[33] Pub. L. No. 111-5, § 2201(a)(4).

[34] The BFS is an agency within the Department of the Treasury that manages the federal government's central payments, collections, and deposit systems. *See* Bureau of Fiscal Serv., Fiscal Service Overview, https://www.fiscal.treasury.gov/about.html. Relevant to this action, BFS performs the ministerial function of sending out physical checks and making direct deposits of the Economic Impact Payment.

[35] U.S. Dep't of Treasury, Inspector General for Tax Administration, Interim Results of the 2020 Filing Season: Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions (June 30, 2020), at 5, https://www.treasury.gov/tigta/auditreports/2020reports/202046041fr.pdf.

practice Defendants are also failing to issue payments to Class Members in pre-trial detention facilities.

59.    By refusing to send Economic Impact Payments to incarcerated people, intercepting payments that had already been issued, and publishing FAQ Number 15, the IRS is usurping the lawmaking power that properly rests with the legislative branch. The Constitution grants Congress authority to draft and enact legislation. The IRS and Treasury Defendants have no legal authority to disregard Congress's clear and absolute language in the CARES Act. Instead, Defendants must implement the law as written.

**D.    Defendants' actions obstruct Congress's goals in passing the CARES Act.**

60.    The CARES Act is designed to provide fast and direct economic assistance to individuals—to help those who are struggling, as well as to strengthen the economy, support businesses, and preserve jobs.[36] By providing Economic Impact Payments directly to "eligible individuals," the CARES Act gives low and middle-income Americans the means to make day-to-day purchases and pay bills at a time when they may have lost a job or had their work hours reduced. Enabling consumers to spend money on needed goods and services in turn bolsters the business sector and strengthens the economy.

61.    While in prison or jail, incarcerated people consume goods and services sold by private businesses on a regular basis. For example, incarcerated people purchase basic goods such as food and toiletries at prison or jail commissaries. These items might include sandwiches, soap, toothpaste, toothbrushes, and laundry detergent. COVID-19 has interrupted daily life in jails and prisons because many correctional institutions have tried to reduce the spread of

---

[36] U.S. Dep't of Treasury, The CARES Act Works for All Americans, https://home.treasury.gov/policy-issues/cares.

COVID-19 by instituting lockdowns. During lockdowns, expenses for incarcerated people may increase since they receive lower quality food or fewer meals and will need to buy food from the commissary to supplement their diet.[37]

62. In most states, incarcerated people pay relatively high co-pays for health services.[38] Economic Impact Payments would provide incarcerated people with the necessary resources to seek medical care. This has the potential to save lives as COVID-19 has devastated jails and prisons across the country.

63. Inmates must pay a premium for services such as internet access, video visits, and telephone calls—all of which are provided by private contractors. Contact with families and friends outside prison walls are essential for incarcerated persons' hopes of rehabilitation.[39] As everyday Americans have been required to limit their in-person contact to prevent the spread of COVID-19, electronic communication has become an invaluable tool to safeguard public health and fight the ever-present feeling of isolation. This is even more true for incarcerated persons facing months of lockdown.

64. Often, the costs of these items are borne by inmates' families.[40] By providing Economic Impact Payments directly to incarcerated people, they are in a better position to cover these expenses themselves and can alleviate the financial strain these costs impose on their

---

[37] Rebecca Boone, *US inmates got virus relief checks, and IRS wants them back*, Associated Press, June 24, 2020, https://apnews.com/0810bb67199c9cef34d4d39ada645a92.

[38] *See* Wendy Sawyer, The steep cost of medical co-pays in prison puts health at risk, Prison Policy Initiative, Apr. 19, 2017, https://www.prisonpolicy.org/blog/2017/04/19/copays/.

[39] Morgan Godvin, Money Changed Everything for Me In Prison, The Marshall Project, April 11, 2019, https://www.themarshallproject.org/2019/04/11/money-changed-everything-for-me-in-prison.

[40] *See* Wendy Sawyer, The steep cost of medical co-pays in prison puts health at risk, Prison Policy Initiative, Apr. 19, 2017, https://www.prisonpolicy.org/blog/2017/04/19/copays/ (detailing average prison wages by state compared to state's minimum wage).

families. This relief is critical for family members, who are often struggling to make ends meet under normal circumstances, and goes to the heart of the CARES Act's purpose.

65.     In line with the purpose of the CARES Act, spending by Plaintiffs in prison or jail—on food, healthcare, technology, and other consumer goods and services from private vendors—bolsters the business sector and strengthens the economy. With the CARES Act, Congress intentionally disbursed funds to low and middle-income people who are most likely to spend the money in ways that help keep companies and workers in business during the economic crisis.

66.     The COVID-19 Pandemic has also caused large numbers of incarcerated people to be released early. Finding a job after incarceration is difficult enough under normal circumstances, but it is particularly challenging now given the extraordinary increase in nationwide unemployment. The Economic Impact Payments are vital in helping newly released individuals purchase food, housing, and clothing.

**E.     Defendants' actions violate the law and have caused substantial harm to Plaintiffs.**

67.     Congress mandated that Defendants provide all "eligible individuals" with an Economic Impact Payment as soon as possible. Through their actions detailed above, Defendants have violated the plain text of the CARES Act and deprived Plaintiffs and the Class of their entitlement to these payments.

68.     The harm to Plaintiffs caused by Defendants' misconduct is staggering. As of May 21, 2020, the IRS had issued 84,861 Economic Impact Payments of approximately $1,200 each to incarcerated individuals.[41] When Defendants changed course and intercepted these

---

[41] U.S. Dep't of Treasury, Inspector General for Tax Administration, Interim Results of the 2020 Filing Season: Effect of COVID-19 Shutdown on Tax Processing and Customer Service

payments, they deprived Plaintiffs and their families of over $100 million worth of funds Congress entitled them to receive.

69.     Upon information and belief, Defendants have ceased sending Economic Impact Payments to incarcerated people, likely denying to Plaintiffs and the Class over one million payments that they are entitled to receive.

70.     Defendants' denial of these payments to incarcerated individuals likewise seriously harms low-income families who are beneficiaries of child-support orders—the only offset provision that Congress deemed sufficiently important to retain with respect to the Economic Impact Payments. Many incarcerated individuals become subject to such orders, because they earn little or nothing while in prison, and therefore cannot pay their child-support obligations. Thus, many Class Members' Economic Impact Payments would be offset and paid directly to the beneficiaries of these orders—children and their caregivers who are not incarcerated and are in urgent need of support.

71.     Incarcerated individuals disproportionately come from our nation's minority, impoverished, and historically disadvantaged communities—communities that COVID-19 has disproportionately harmed. Congress specifically directed the Economic Impact Payments to these low-income communities. This is unprecedented; *never* before has a similar anti-poverty tax credit or stimulus payment been available to individuals without any earned income. This demonstrates Congress's clear direction to support families and businesses, no matter their incomes or station in society.

---

Operations and Assessment of Efforts to Implement Legislative Provisions (June 30, 2020), at 6, https://www.treasury.gov/tigta/auditreports/2020reports/202046041fr.pdf.

72.     Defendants' arbitrary and capricious denial of these payments to incarcerated individuals harms them directly, in denying a benefit that Congress expressly provided. Yet the disparate impact of these denials on our low-income and minority communities harms more broadly. Lawless edicts of executive agencies diminish the trust in government that must exist to preserve our federal, democratic system. This concern predominates among communities, such as those represented by the Class Members, that have consistently had reason to mistrust government.

73.     More broadly, arbitrary government action harms all of us, Plaintiffs included. Simply put, under our Constitutional system, it is for Congress to legislate and for the Executive to implement that legislation. Here, the Executive has, without authority, determined its own law. It seeks to deny a politically unpopular group a federal benefit that Congress commanded. This, our laws and our Constitution do not allow

## V.     CLASS ALLEGATIONS

74.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and all members of the following Class (the "Class"):

> Every person throughout the United States who is an "eligible individual," as defined by 26 U.S.C. § 6428(d)), to receive an Economic Impact Payment but did not receive one because they:
>
> a)  meet the criteria described in Section 202(x)(1)(A)(i)-(v) of the Social Security Act; or
>
> b)  were or are otherwise incarcerated in a federal, state, or local, prison, jail, or other penal institution.

75.     Class Identity: The above-defined Class is readily identifiable and is one for which records should exist.

76.     Numerosity: Plaintiffs do not know the exact number of Class Members at this time. Plaintiffs believe the Class includes tens of thousands of individuals, and more likely over

a million individuals, across the United States. The members of the Class are so numerous that joinder of all Class Members is impracticable.

77. Common Questions Predominate: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Nearly all factual, legal, and statutory relief issues raised in this Complaint are common to each of member of the Class and will apply uniformly to every member of the Class. Among the questions of law and fact common to Class Members are:

    a. whether Defendants have a legal obligation to cause the IRS to send Economic Impact Payments to Plaintiffs pursuant to 26 U.S.C § 6428;

    b. whether Defendants unlawfully promulgated the policy in "EIP Eligibility and General Information," IRS FAQ Number 15;

    c. whether Defendants' conduct depriving Class Members of an Economic Impact Payment violated the plain text of the CARES Act;

    d. whether Defendants caused harm to Class Members by depriving them of an Economic Impact Payment to which they were entitled;

    e. the appropriate Class-wide measure of damages;

    f. whether, and in what amount, Plaintiffs and other Class Members are entitled to recover court costs and attorneys' fees; and

    g. whether Defendants' wrongful conduct is continuing to harm Plaintiffs and the Class, thus entitling the Class to declaratory and injunctive relief to ensure Defendants issue their Economic Impact Payments.

78. Typicality: Plaintiffs' claims are typical of the claims of other members of the Class because Plaintiffs and every member of the Class have suffered similar injuries as a result

of the same conduct by Defendants alleged herein. Plaintiffs have no interest adverse to the interests of the other members of the Class.

79. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained able counsel with extensive experience in class action litigation, tax litigation, and prisoners' rights litigation. The interests of Plaintiffs are coincident with—and not antagonistic to—the interests of other Class Members.

80. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. Moreover, because the damages suffered by individual members of the Class are relatively small, the expense and burden of individual litigation make it impossible for Class Members to redress the wrongs done to them on an individual basis. The Class is readily definable, and prosecution of this action as a class action will eliminate the possibility of repetitious litigation. There will be no difficulty in the management of this action as a class action.

81. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

82. Plaintiffs and other members of the Class have suffered damages as a result of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants will retain substantial funds appropriated by Congress for other purposes, and such unlawful and improper conduct shall, in large measure, go unremedied. Absent a class action, Class Members will not be able to effectively litigate these claims and will suffer further losses, as Defendants will be allowed to continue such conduct with impunity.

## VI.    CAUSES OF ACTION

### COUNT I
**Violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(1) for failure to make Economic Impact Payments to incarcerated people in violation of the Cares Act (Claim For Declaratory And Injunctive Relief)**

83.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein. This Count is asserted against all Defendants.

84.    Pursuant to the APA, a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

85.    Section 2201(a) of the CARES Act, codified at 26 U.S.C § 6428(f), requires the Treasury Secretary to issue $1,200 Economic Impact Payments to eligible individuals, as defined in 26 U.S.C. § 6428(c), (d), and (g), "as rapidly as possible."

86.    Plaintiffs were and are "eligible individuals" within the meaning of 26 U.S.C § 6428. Among other things, they earn equal to or less than the adjusted gross income threshold specified in subsection (c). And they do not fit within any of the excluded categories specified in subsection (d) or (g).

87.    Defendants violated 26 U.S.C § 6428(f) and 5 U.S.C. § 706(1) when they failed to make Economic Impact Payments to incarcerated people, including Plaintiffs.

88.    By refusing to make Economic Impact Payments, Defendants have "unlawfully withheld" action that Congress compelled in 26 U.S.C § 6428(f).

89.    By not making Economic Impact Payments "as rapidly as possible," Defendants have "unreasonably delayed" action that Congress compelled in 26 U.S.C § 6428(f).

90.    As a result of Defendants' misconduct, each Plaintiff has sustained injury in the form of, among other things, being deprived of at least $1,200 they should have received.

91.     In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, request judgment as follows:

    a.   A Judgment that Defendants violated 5 U.S.C. § 706(1);

    b.   A Judgment that Plaintiffs are "eligible individuals" within the meaning of 26 U.S.C § 6428;

    c.   An Order compelling Defendants to disburse to Plaintiffs the payments described in 26 U.S.C § 6428 as rapidly as possible;

    d.   An Award of attorneys' fees and costs; and

    e.   Such other relief as the nature of the case may require or the Court may deem just and proper.

## VII.COUNT II
**Violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2) for issuing IRS FAQ Number 15 and establishing an IRS policy that denies Economic Impact Payments to incarcerated people, in violation of the CARES Act.**
**(Claim for Declaratory and Injunctive Relief)**

92.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

93.     Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

94.     No provision in the CARES Act, 26 U.S.C § 6428, or elsewhere in the Internal Revenue Code or other federal law, prohibits the provision of payments under 26 U.S.C § 6428 to incarcerated individuals.

95.     Defendants issued a FAQ regarding "EIP [Economic Impact Payment] Eligibility and General Information," published on the IRS.gov website, stating that incarcerated persons do not qualify for Economic Impact Payments and that such Payments initially made to incarcerated persons should be returned to the IRS. (Q15, A15)

96.     Defendants further took action to intercept and retrieve at least 84,861 payments that the IRS had lawfully issued to incarcerated individuals.

97.     Defendants acted arbitrarily and capriciously, and not in accordance with law, in issuing IRS FAQ Number 15, which established an IRS policy, under which the IRS relied to deny payments Congress required under 26 U.S.C § 6428, and to intercept payments it had already sent.

98.     In taking this agency action and causing the IRS and Department of Treasury to deny the payments Congress mandated under 26 U.S.C § 6428, Defendants acted in excess of their statutory authority.

99.     At all relevant times, Plaintiffs were and are incarcerated individuals who have been denied Economic Impact Payments based on this status.

100.     As a result of Defendants' misconduct, each Plaintiff has sustained injury in the form of, among other things, being deprived of $1,200 they should have received.

101.     In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, request judgment as follows:

a.   A Judgment that Defendants violated 5 U.S.C. § 706(2);

- 26 -

b. A Judgment that Defendants unlawfully promulgated the policy in "EIP Eligibility and General Information," IRS FAQ Number 15, and unlawfully intercepted the payments it had issued to incarcerated individuals;

c. An Order compelling Defendants to rescind the unlawful policy in the "EIP Eligibility and General Information," IRS FAQ Number 15, and to revise the FAQ to make clear that incarcerated people do qualify for Economic Impact Payments;

d. An Award of attorneys' fees and costs; and

e. Such other relief as the nature of the case may require or the Court may deem just and proper.

## VIII. COUNT III
### Claim for damages pursuant to the CARES Act, 26 U.S.C. § 6428 and the Little Tucker Act, 28 U.S.C. § 1346(A)(2)

102. Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

103. The CARES Act, as codified at 26 U.S.C. § 6428, is an "Act of Congress" that obligates the United States, through Defendants, to disburse funds for the benefit of Plaintiffs.

104. Defendants have failed to disburse funds that Congress mandated be disbursed to Plaintiffs by the CARES Act.

105. As a result of Defendants' legal violation, each Plaintiff has sustained injury in being deprived of at least the $1,200 Economic Impact Payments to which they are entitled under the CARES Act.

106. Each Plaintiff is entitled to a $1,200 payment. Some Plaintiffs may be entitled to an additional $1,200 payment if they are married and elect to file jointly; others may be entitled to an additional $500 payment if they have qualifying children. No individual plaintiff's total

claim for damages exceeds the $10,000 limit under which this Court has jurisdiction to hear this case.

107.    In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

108.    Plaintiffs waive any claim to a damages award greater than $10,000 per person.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, request judgment as follows:

1.    Certify a class pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3).

2.    Enter judgment that Defendants violated 5 U.S.C. §§ 706(1) and 706(2), and that the United States is liable for damages pursuant to 28 U.S.C. § 1346(a)(2) for violation of the CARES Act, 26 U.S.C. § 6428;

3.    Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201:

    a.    that Defendants unlawfully promulgated the policy in "EIP Eligibility and General Information," IRS FAQ Number 15; and

    b.    that Defendants have a legal obligation to cause the IRS to send Economic Impact Payments to Plaintiffs as Congress mandated under 26 U.S.C § 6428;

4.    Enter an injunction to:

    a.    order Defendants to rescind the unlawful policy in the "EIP Eligibility and General Information," IRS FAQ Number 15, and to revise the FAQ to make clear that incarcerated individuals do qualify for Economic Impact Payments;

    b.    order Defendants to disburse to Plaintiffs the payments described in 26 U.S.C § 6428 as rapidly as possible, and before December 31, 2020; and

      c.   order Defendants to report to this Court when they have complied with the

          preceding orders;

5.      Award Plaintiffs reasonable attorneys' fees, costs, expenses, and other

disbursements for this action; and

6.      Grant any other relief this Court deems just and proper.


DATED: July 31, 2020            Respectfully submitted,

                            By: */s/ Jeannie Y. Evans*

                            Jeannie Y. Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
jeannie@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Christopher R. Pitoun (*Pro Hac Vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Ave, Suite 920
Pasadena, CA 91101
Telephone: (213)-330-7150
Facsimile: (213)-330-7152
christopherp@hbsslaw.com

Michael Kanovitz
Sarah Grady
Elliot Slosar
LOEVY & LOEVY
311 North Aberdeen Street, Third Floor
Chicago, IL 60607
Telephone: 312-243-5900

mike@loevy.com
sarah@loevy.com
elliott@loevy.com

Patrick W. Thomas (*Pro Hac Vice* forthcoming)
Notre Dame Tax Clinic
725 Howard Street
South Bend, IN 46617
Telephone: (574) 631-9149
pthomas3@nd.edu


*Counsel for Plaintiffs and the Proposed Class*